UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No: 18-10246-DPW |
| | ) | |
| ROBERT H. BRADY, | ) | |
| Defendant. | | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States submits this Sentencing Memorandum in the above-captioned case, currently scheduled for sentencing on June 10, 2019. For the reasons outlined in this memorandum, the Government believes that a sentence of 75 months' imprisonment, the mid-range of the advisory guidelines, is the appropriate sentence in this matter. Following the completion of this sentence, the Government requests that the defendant be on supervised release for a period of 36 months, be ordered to pay a mandatory special assessment of $100.[1]

**I.   PROCEDURAL HISTORY**

On August 2, 2018, Jason M. Nobles ("Nobles") was charged in a one-count indictment with bank robbery, in violation of 18 U.S.C. § 2113(a). On February 7, 2019, Nobles pled guilty to a

---

[1] According to FBI reports, $912.00 was taken during the commission of the robbery, was recovered from Brandy and returned to the bank.

1

one-count indictment charging him with bank robbery in violation of 18 U.S.C. § 2113(a).

## II. OVERVIEW OF THE INVESTIGATION[2]

On June 28, 2018, at approximately 11:21 a.m., an individual ("the robber"), carrying a black bag, entered a branch of the Cambridge Savings Bank, located at 1 Thompson Square, Charlestown, Massachusetts, and approached two bank tellers.  As the robber approached the tellers, he stated words to the effect, "Give me everything in the drawer. Hurry, go to the vault." The tellers then removed their cash drawers and placed the drawers in front of the robber.  The robber then removed money from the tellers' cash drawers and placed the money in the black bag he had been carrying.  Contained within the money were two GPS tracking devices, which automatically activated upon being removed from the cash drawer. After taking the bank's money, the tellers recalled that the robber stated, "Don't do anything for five minutes, or I'll come back and blow this place up." The robber then exited the bank.

One of the tellers ("Teller 1") who had interacted with the robber described him as a thin white male, approximately 5'8" tall.  The teller stated that he was wearing a white mask, which

---

[2] The facts recited in this memorandum are taken from the facts submitted by the government during the February 7, 2019, Rule 11 hearing.

partially covered his face, a dark hooded sweatshirt, dark pants and gloves.  The other teller ("Teller 2") stated that he thought he knew the robber.  Teller 2 stated that he believed the robber was Brady. Teller 2 stated that Brady is a customer of the bank and that he, Teller 2, had recently interacted with Brady regarding Brady's application for a credit card.

The bank's interior and exterior surveillance cameras were operating and functioning on the date of the robbery. The cameras captured images of the robber as he entered the bank's lobby before and after the robbery, and images of the robber as he approached and interacted with the two tellers.  These videos show images of the robber that are consistent with the description provided by the bank's teller.  In the videos, the robber appears to be a thin white male carrying a black bag, wearing a dark hooded sweatshirt, dark pants, one dark colored glove (the other hand appears not to be gloved) and dark shoes.

A post-robbery audit determined that the robber had taken $912.00 in United States currency during the robbery.

Information about the robbery and a description of the robber's appearance was relayed to the Boston Police and the FBI's Violent Crimes Task Force ("VCTF").  In addition, the GPS tracking devices were being updated and were providing "real

time" locations of the bank's money. Law enforcement learned that the GPS was giving off signals in and around the area of Bartlett and Walker Street, heading in the direction of Sullivan Square. The location of the GPS signals was approximately .4 miles from the bank.

One of the officers, in a marked cruiser, went to that specific location and observed a thin white male, approximately 5'8" tall, walking on the sidewalk. The officer noted that the individual was wearing a red jacket and dark pants. The officer noted that as he approached the individual, the individual continued to look over his shoulder at the officer's cruiser. After a few moments, the officer observed the individual break into a run and sprinted away from the officer. The officer exited his cruiser, identified himself as a Boston Police officer, and commanded the individual to stop.

The officer pursued the individual, repeatedly commanding the individual to stop, show his hands, and get on the ground. Eventually the individual stopped, got on the ground and placed his hands behind his back. The individual later identified as Brady, stated words to the effect, "I fucked up, it's on me." The officer then pat-frisked Brady and recovered a large sum of

money stuffed in Brady's pants.  Contained within that money was one of the aforementioned GPS tracking devices.

Brady was taken into custody and returned to the Boston Police Station for booking and processing.  Following Brady's arrest, additional officers searched the area where Brady had been observed running and located and seized additional discarded money, which contained the other GPS tracking device.

Once at the station Brady was advised of his *Miranda* rights and asked if he would agree to an interview.  Brady indicated that he would consent to an interview and signed a form acknowledging the same.  The interview was both video and audio recorded.

During the interview, Brady stated that he had robbed the bank earlier.  Brady was shown pictures of the robbery and stated that he was the person in the pictures.  Brady said that he had an account at this bank and had been in the bank on previous occasions. The officers asked Brady if he remembered where the clothing he was wearing during the robbery was and he, Brady, stated that he dumped the clothing.  Brady stated that he arrived in the Charlestown area earlier in the day, met up with an unknown woman, and then he decided to rob a bank.

5

**III. <u>GUIDELINE ANALYSIS</u>**

    **A. Offense Level Computation**

    ¶¶ 23 and 24 Offense Level

The Government agrees with Probation's conclusions that Brady' Base Offense Level is 20, and that a two-level increase is applicable as Nobles robbed a financial institution.

    ¶ 25 Specific Offense Characteristics

The Government agrees with Probation's conclusions that since a threat of death was made during the commission of the robbery a two-level increase is applicable.

    ¶ 29 Adjusted Offense Level

The Government agrees with Probation's conclusions that Nobles Adjusted Offense Level is 24.

    ¶ 33 Total Offense Level

The Government agrees with Probation's conclusions that, the Total Offense Level incorporating the above adjustments and a three-level for Brady's prompt acceptance of responsibility is 21.

**B. The Defendant's Criminal History**

¶ 40 and 41

The Government agrees with Probation's conclusions that the defendant's criminal history score is 11, which establishes a criminal history category of V.

**C. Sentencing Options**

¶ 91   Guideline Provisions

The Government agrees with Probation's conclusions that based on a Total Offense Level of 21, and a Criminal History Category of V, Brady's guideline imprisonment range is 70 to 87 months.

**IV.** *SENTENCING RECOMMENDATION*

18 U.S.C. § 3553(a) requires a sentencing court to consider specific enumerated factors when determining an appropriate sentence.  These factors include: 1) the nature and circumstances of the offense and the history and characteristics of the defendant and 2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant.

For the reasons detailed below, the Government believes that a sentence of 75 months' imprisonment is fair and just and takes into account the factors enumerated in 18 U.S.C. § 3553(a).

Brady has a life-long history of arrests and convictions. Brady's criminal career commenced in 1997 and has continued uninterrupted until this recent arrest in 2018. Brady has been convicted of crimes on a number of occasions and has been sentenced to prison on four occasions, with many of these having lengthy sentences.

Following the completion of his sentences, Brady has not had success on supervised release and has been violated on numerous occasions as a result of new criminal charges and or failing drug screens.

Brady has had numerous opportunities, while in and out of prison to take advantage of programs which, would aid him with these various issues. It is truly unfortunate, that it appears the only time Brady is not involved in criminal activity or drug use is when he is incarcerated. The Government's recommendation, while severe, appears to be the only solution to curbing this behavior.

## V. CONCLUSION

Brady is 41 years old and continues to disregard the law and refuses to conform his behavior to acceptable societal norms. This cannot continue. Brady's sentence is dictated by his own actions and decisions, and is necessary to protect the public, and to deter similar conduct from others.

Based on Brady's behavior, the Government is well within its rights to request a maximum sentence of 20 years' imprisonment. However, for the reasons stated herein, the Government requests this Court impose a sentence of 75 months' imprisonment, the mid-range of the guidelines. The Government requests this Court to suggest to Brady to take advantage of BOP's 500 hour Residential Drug Abuse Program. Following the completion of this sentence, the Government requests that Brady be placed on supervised release for a period of 36 months.

This is a just and appropriate sentence as dictated by the circumstances of this case and Brady's life-long criminal history.

                                    Respectfully submitted,

                                    ANDREW E. LELLING
                                    United States Attorney

                         By:  **/s/ Kenneth G. Shine**
                                    KENNETH G. SHINE

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the foregoing upon all counsel of record by email.

*/s/ Kenneth G. Shine*
KENNETH G. SHINE