UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 18-cr-10246-DPW |
| | ) | |
| ROBERT BRADY | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

## I.     Introduction

Robert Brady has spent far too much of his life in federal prison. Three prior convictions were all federal prosecutions, charging decisions that originated with a criminal contempt conviction in 1999 for refusing to testify in the grand jury in a murder investigation in which Mr. Brady was an indirect witness but never a suspect. PSR ¶ 36; *United States v. Brady*, 168 F.3d 574 (1st Cir. 1999).  Two convictions for felon-in-possession of a firearm followed in 2007 and 2010. PSR ¶¶ 37, 38. His transitions after release from the first two sentences were unsuccessful, as they included supervised release violations and/or new criminal conduct. PSR ¶¶ 36, 37.

Yet the story of Robert Brady's current offense is not a straight line of unrepentant recidivism. He was released from the third federal sentence on November 26, 2013. PSR ¶ 39. From that point on, he did not commit another crime until the present offense on June 28, 2018, a span of 57 months, the longest by far of any post-release period. His supervised release in the 2010 case terminated without further incarceration or extension of the original term, the first time he had so succeeded. *Id*. He struggled with substance abuse throughout this period, but also consistently returned to treatment. PSR ¶¶ 39, 78, 79. He was gainfully employed for more than four years of that time. PSR ¶¶ 83-85.

That extended period of success following his 2013 release proves that Robert Brady made significant changes. While still struggling with his long-term addiction, he had learned how to manage that struggle without resorting to crime. The story of why he did return to crime, in the strange circumstance of robbing his own bank and a teller who recognized him from recent interactions, cannot be told without understanding the disruption that followed an anoxic brain injury in December 2014. PSR ¶¶ 65-68. His father found him unconscious one morning and he was rushed to the hospital. PSR ¶ 65. During this incident he was without a pulse for 10 minutes, and consequently suffered an anoxic brain injury due to a lack of oxygen to the brain. Exhibit A, Independent Neuropsychological Evaluation (filed separately under seal). This injury will have lifelong consequences for Robert Brady, including executive functioning deficits, significant memory problems, and exacerbation of his depression and substance abuse. Exhibit A at 6. The effects of the brain injury are neither justification nor excuse for Robert Brady's crime. They are, however, important to understanding why Robert Brady committed this crime at this time in this manner. Mr. Brady's long-term challenges in managing his symptoms are relevant to the sentence this Court imposes because they provide mitigation, require specific conditions upon release, and will make him more vulnerable during his incarceration. Considering all these facts in light of the sentencing factors at 18 U.S.C. § 3553(a), the defense recommends a sentence of 48 months incarceration and the maximum three years supervised release. Sentencing with parsimony under the statute requires a "holistic inquiry" because "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors through which runs the thread of an overarching principle." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).  In this particular case and for this particular defendant, a sentence of 48 months incarceration and three years supervised release is one "that is *minimally* sufficient to achieve the

broad goals of sentencing." *Id*. (emphasis supplied).

II.   **The effects of Robert Brady's brain injury matter because they "set the stage" for this robbery, make him more vulnerable while imprisoned, and require specific attention when released.**

An anoxic brain injury is one in which the brain suffers a total lack of oxygen. Exhibit B, "Hypoxic-Anoxic Brain Injury," *Family Caregiver Alliance*, at 1 (2004). When Robert Brady was found unresponsive on the morning of December 19, 2014, he suffered an anoxic brain injury because he was without a pulse for 10 minutes. Exhibit A at 1. Emergency personnel administered two doses of Narcan, causing him to vomit and aspirate, which likely caused the cardiac arrest that led to the loss of a pulse and the flow of oxygen to the brain. *Id*. He was placed into a cooling protocol to try to mitigate the harm of his injury, and was not re-warmed for two days. *Id*. Mr. Brady was in a coma during this time. Exhibit A at 4. He spent two weeks at Massachusetts General Hospital (MGH), and then was transferred to Spaulding Rehabilitation Hospital (SRH) for three weeks. PSR ¶ 65-66; Exhibit A at 2. Providers suspect that Mr. Brady may have become unconscious from ingesting an illegal substance, but because toxicology screens from his admission were negative, the cause of this traumatic event was never determined. PSR ¶ 65; Exhibit A at 1-2. Mr. Brady himself does not remember the events that left him unconscious.

From the moment he awoke at MGH, Robert Brady experienced the effects of his injury, including significant memory loss, poor insight, impulsivity, and proneness to falls. Exhibit A at 2. During his inpatient rehabilitation at SRH, he displayed a host of symptoms, including: severe memory deficits, problem-solving deficits, attention deficits, depressed mood, agitation, insomnia, anxiety, and headaches. *Id*.; PSR ¶ 66.  After his discharge from SRH he participated

in outpatient occupational therapy, physical therapy, and speech language pathology therapy. *Id.*

A formal neuropsychological evaluation was conducted in June 2015, seven months after the injury and six months after his discharge from SRH. That evaluation showed significant weaknesses in attention, executive functions (including impulse control and cognitive efficiency), language, and learning/memory. Exhibit A at 2; PSR ¶ 67. As shown in the report of Mr. Brady's recent neuropsychological evaluation, all of those symptoms have persisted through the last four years. The recent evaluation, which included an interview, records review, and testing, showed continued memory loss and a reduced ability to learn new information in a manner that unfortunately indicates permanent deficits. Exhibit A at 7. He showed inefficiency in processing information. *Id.* He was vulnerable to errors. *Id.* He displayed below average higher order reasoning, including verbal abstraction, concept formation, and mental flexibility. *Id.* He displayed these deficits even in a testing situation that presented minimal stress and allowed him to focus. *Id.*

Mr. Brady's symptoms create a set of significant obstacles in his day-to-day functioning. At times he has difficulty communicating because of an inability to retrieve words. PSR ¶ 68. At work, his poor short-term memory left him unable to remember his next task. He has given the example of walking down one level at a job site, but then forgetting why he was there and what he was supposed to do. Although he worked as a laborer for approximately three-and-a-half years, he eventually lost this position because his poor memory too often interfered with his ability to do the job properly. PSR ¶¶ 68, 83.

Mr. Brady's deficits in executive functioning make it more difficult for him to stay organized and focused, and as a result he gets frustrated and overwhelmed easily. PSR ¶ 68. Importantly, the serious symptoms he experiences as a result of his brain injury are layered on

top of pre-existing addiction, depression, and anxiety. PSR ¶¶ 70-71, 76-79. He has a history of

trauma from repeated assault at age 11, a life-changing event which he has never disclosed to his

mother in an effort to protect her. PSR ¶ 53. His father was an alcoholic and verbally abusive.

PSR ¶ 52. He himself began using alcohol and marijuana at 13, and by 16 he was using powder

cocaine and PCP, the latter of which lasted until his first incarceration at age 19. PSR ¶ 76.

Rather than preventing him from using drugs, federal prison actually introduced him to heroin, a

new addiction which continued long after his release. PSR ¶ 77. Despite recurring engagement

with treatment, Mr. Brady has continued to use substances during periods of release. PSR ¶¶ 76-

79.

Mr. Brady was suffering from the combination of all these problems in the time leading

up to the present offense. Each problem- executive functioning deficits, memory loss, word loss,

depression, anxiety, and addiction- exacerbated the others. He became so desperate that he

ruminated on suicide and made suicidal gestures. PSR ¶ 73; Exhibit A at 7. Dr. Catherine

Leveroni, who conducted the recent neuropsychological evaluation, found the following in her

report:

> He was easily overwhelmed and given to feelings of panic. These symptoms were
> present at the time of the robbery and persist to the present time. Strong negative
> emotion, agitation, hopelessness, and a desire for self-harm exacerbated his executive
> cognitive deficits, making it very difficult for him to organize his thoughts, problem
> solve, and reason. In this way, his psychiatric status represented an additional
> vulnerability to act on impulse without thought for the consequences of action.
>
> It is my opinion that the combination of Mr. Brady's neurodevelopmental vulnerability
> with his severe acquired anoxic brain injury resulted in neurocognitive and
> neurobehavioral disorder that set the stage for the robbery.
>
> Exhibit A at 7.
>
> Mr. Brady's various neuropsychological symptoms will make him more vulnerable in

prison than an inmate without such deficits. For example, if another inmate asks him to return a borrowed item, he cannot be sure that the item is not actually his because he has no memory of the transaction. Exhibit A at 3. He is concerned that inmates who learn of his disability will take advantage of him this way. *Id.* At the work site, forgetting the required task results in termination. PSR ¶ 83. In prison, forgetting his task or where he is supposed to be at a given time could very well be treated as refusal and treated as a disciplinary violation. Mr. Brady's proneness to being overwhelmed will be a constant challenge in the pressure cooker of federal prison. It is to his credit that during his pretrial detention he has managed all of these stressors without receiving any disciplinary reports. PSR ¶ 4. However, that success does not change the fact that his particular challenges will make him more vulnerable during the remainder of any sentence he receives.

Robert Brady's hopelessness, impulsivity, and reduced ability to organize his daily life are all evident in the choice to rob his own bank. Despite the fact that Mr. Brady wore a mask, one of the tellers recognized Mr. Brady specifically because they had recently discussed Mr. Brady obtaining a credit card. PSR ¶ 9. Robbing one's own bank, where the employees can identify your voice, shows even less rational thought than an addict who passes a note to feed a habit. There is no shortage of banks within walking distance of Mr. Brady's own. This decision reveals the impulsivity that is a documented symptom of his injury. Indeed, when Mr. Brady confessed to the crime he stated that he only made the decision to rob the bank earlier that very day. PSR ¶ 17.

The decision to rob one's own bank, where the employees know your voice and your identity, begs the question of whether Mr. Brady became so overwhelmingly hopeless in his inability to function normally that committed a crime in order to get caught. Mr. Brady himself

wonders if this was a subconscious motivation in the spur of the moment. In addition to his

mental illness, addiction, and impaired functioning, he is also a person who became an adult

during an 87-month prison sentence. PSR ¶ 36. If indeed in the moment Mr. Brady gave up and

wanted to get caught, this Court should not oblige his despair by sentencing him to any more

incarceration than is "necessary," as is required under the statute. 18 U.S.C. § 3553(a).

While the defense agrees that incarceration is necessary, the advisory guideline range of

70-87 months in no way accounts for the way Robert Brady's serious brain injury "set the stage"

for the robbery. The advisory range also does not account for his increased vulnerability in

prison. Nor does the range account for Robert Brady's accomplishments during the more than

four-and-half years of employment and non-offending following his release in November 2013.

That he continued to struggle with addiction during that period, PSR ¶ 78-79, increases rather

than diminishes the accomplishments of steady employment and non-offending. Robert Brady

succeeded in making true change. That success was undone by an impulsive, irrational decision

that likely would not have been made but for the significant and new problems he suffered

following his anoxic brain injury. Robert Brady's extended success, and the reasons for his

failure, are strong grounds for the requested variance downward to 48 months incarceration and

three years supervised release.

Mr. Brady's specific challenges will require specific conditions of supervision when he is

ultimately released. Mental health and substance abuse treatment as directed by the probation

department are clearly warranted. The appropriate response to the symptoms of his brain injury

presents a more difficult question. There is evidence that at least some of his deficits are

permanent. Exhibit A at 7. Treatment for anoxic brain injury in general is limited. Exhibit B at 4.

Therefore, management of symptoms through adaptation will likely be a priority. To this end,

Mr. Brady should be required, and the probation should assist him, in finding appropriate

therapeutic and vocational services. Potential service providers include the Massachusetts

Rehabilitation Commission (https://www.mass.gov/orgs/massachusetts-rehabilitation-

commission) and the Brain Injury Association of Massachusetts (www.biama.org). Mr. Brady

desires appropriate services, and reports that he previously applied to the Statewide Head Injury

Program (SHIP), but was denied because the program requires that the injury be external and

traumatic, rather than anoxic. See SHIP website at  https://www.mass.gov/service-

details/statewide-head-injury-program-ship. Of course, the very fact that Mr. Brady will be under

supervision will mean that the probation department will be able to offer a variety of services

while also monitoring his sobriety and functioning to try to prevent him from becoming

despondent and overwhelmed. Given the circumstances of Mr. Brady's offense, supervision will

be far more likely than incarceration in preventing recidivism.


### III.     Specific circumstances led to federal prosecution of three of Mr. Brady's four total prior convictions.

The fact that this is Robert Brady's fourth federal prosecution is not in his favor. It is true

that he stands out among offenders for the number of federal crimes for which he has been

convicted.

The decisions to prosecute each of his crimes[1] federally stem from the circumstances of his

first federal offense.  At age 19 he was an indirect witness in a federal murder investigation. PSR

¶ 36. When summonsed to the Grand Jury, he refused to testify despite a grant of immunity, and

---

[1] His only conviction that was not a federal prosecution was a shoplifting case from New Hampshire. PSR ¶ 37.

8

later pled guilty to criminal contempt. *Id*. For a first incarceration, he received an 87-month

federal prison sentence. *Id*. Under the mandatory guidelines sentencing in effect at the time, that

sentence was appealed but affirmed because the First Circuit found that the choice of guideline

among several possibilities for criminal contempt was not clearly erroneous. *United States v.*

*Brady*, 168 F.3d. 574, 580 (1999). The First Circuit found that the result was one of Mr. Brady's

own making, but acknowledged that 87 months was a "severe" penalty "for a then 19-year-old

with an otherwise clean record and a good many touching letters in his favor." *Id* at 581.

Robert Brady did not emerge from that sentence unscathed. He first used heroin in prison.

PSR ¶ 77. His drug use continued after his release, and he violated his supervised release through

new criminal activity, use of illegal drugs, and criminal association. PSR ¶ 36. In 2007, perhaps

with this background in mind, federal agents targeted him for an undercover sting. PSR ¶ 38. He

was stung, and he pled guilty and received a 24-month sentence. *Id*. Following that sentence he

again violated supervised release and received additional incarceration upon revocation. *Id*. In

2010 he was arrested by Somerville police and charged with a firearm offense. PSR ¶ 39. The

circumstances of that offense might not usually result in a federal prosecution, but by that point

Robert Brady as a defendant essentially belonged to the United States Attorney's Office.

Robert Brady's criminal history is not surprising given the circumstances of his childhood,

adolescence, and young adulthood. Only the fact that three of the prior convictions are federal is

notable. While the choices to reoffend were his, the choices of jurisdiction were not. Many

offenders experience the same failures in reintegrating into society, but almost all of them are

prosecuted in state court. All four of Mr. Brady's prior convictions score for criminal history

purposes, PSR ¶¶ 36-40, and thus are accounted for in the advisory guidelines range. The fact

that three of them are federal should not be an aggravating factor. Robert Brady's particular

history explains why his crimes have been prosecuted in federal court.

## IV.   <u>Conclusion.</u>

Robert Brady's prior failures to reintegrate into society highlight the success he achieved in the more than four-and-a-half years of stable employment and non-offending after his release in 2013. That success became much harder to maintain due to the significant effects of the brain injury he suffered in 2014. His mental illness, addiction, and now cognitive deficits combined to overwhelm him, so that he acted impulsively and irrationally. His conduct and his history justify incarceration, but not within the advisory guidelines range because it does not account for the particular circumstances of this offense and this defendant. For all the reasons argued above, the Court should impose a sentence of 48 months incarceration and three years supervised release with appropriate conditions, because it is a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

Respectfully submitted,
ROBERT BRADY
By his attorney,

*Joshua Hanye*
Joshua Hanye
BBO # 661686
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061

**<u>Certificate of Service</u>**

I, Joshua R. Hanye, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as Identified on the Notice of Electronic Filing ("NEF"), and by e-mail to AUSA Kenneth Shine and USPO Ryan Fox.


Date: <u>June 6, 2019</u>                                        */s/ Joshua R. Hanye*
                                                                   Joshua R. Hanye